Santae TRIBBLE, Appellant,

v.

UNITED STATES, Appellee.

No. 80–628.

District of Columbia Court of Appeals.

Argued March 11, 1982.

Decided June 30, 1982.

David Carey Woll, Rockville, Md., appointed by this court, for appellant.

Helen M. Bollwerk, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, and John A. Terry, John R. Fisher, and David W. Stanley, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KERN and NEBEKER, Associate Judges.

KERN, Associate Judge:

Following a jury trial, appellant was convicted of armed robbery and felony murder arising out of the shooting death of John McCormick on July 26, 1978. D.C.Code 1981, §§ 22–2901, –2401 and –3202.[1] On appeal, appellant raises several issues seeking reversal of his conviction. Upon review of appellant's contentions, we find them unpersuasive and, therefore, affirm his con-

---

1. The docket entries and Judgment and Commitment Order in the instant case erroneously indicate that appellant was convicted of the premeditated murder of John McCormick and found not guilty of the felony murder charge relating to the same victim. This entry is a clerical error, as the separate transcript reporting the return of the jury's verdict demonstrates. Thus, upon remand for the other reasons discussed *infra*, we determine that this clerical error be corrected by the Clerk of the Superior Court. *See* Super.Ct.Cr.R. 36.

viction and sentence of 20 years to life on the felony murder count. However, we conclude that appellant's sentence for armed robbery is illegal under *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), and *Ball v. United States*, D.C.App., 429 A.2d 1353 (1981), and we remand for resentencing in consideration of those cases.

## I.

Appellant was arrested on August 15, 1978, and did not go to trial until January 17, 1980. He now alleges that this 17-month delay violated his Sixth Amendment right to a speedy trial. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Appellant asked for and received leave to file a motion to dismiss the indictment for lack of a speedy trial on October 31, 1979, and the motion was formally filed on November 9, 1979. The court had deferred ruling on the motion until after trial, and oral argument was heard on March 12, 1980.

On May 12, 1980, the trial court denied appellant's motion. Although the court ruled that most of the delay was attributable to the United States, it concluded that this period was of a "more neutral nature" and was not "designed or sought by the government for any tactical advantage." Further, the court recognized that appellant may have suffered anxiety as a result of his pretrial incarceration during the entire 17-month period, but further noted that no evidence had been lost and that appellant had been able to "preserve a substantial and lengthy alibi defense."

■ A showing of more than mere delay is necessary to support a finding of constitutional violation, since the remedy for the denial of the accused's right to a speedy trial is the "draconian" remedy of dismissal of the indictment. *Barker v. Wingo, supra; Bowman v. United States*, D.C.App., 385 A.2d 28, 30 (1978); *United States v. Bolden*, D.C.App., 381 A.2d 624, 626 (1977). In determining whether appellant's Sixth Amendment right to a speedy trial was violated, we must apply the flexible balanc-

ing approach enunciated in *Barker, supra* 407 U.S. at 530, 92 S.Ct. at 2192, and analyze (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. *Ball v. United States*, D.C.App., 429 A.2d 1353, 1356 (1981); *Towles v. United States*, D.C.App., 428 A.2d 836, 841 (1981). However, no single factor is necessary (or sufficient) for a determination of a speedy trial claim, and, while a delay of one year or more between arrest and trial gives prima facie merit to a claim that a deprivation of an accused's speedy trial rights has occurred, *Branch v. United States*, D.C.App., 372 A.2d 998, 1000 (1977), the remaining three factors must still be fully explored. *Bowman v. United States, supra* at 30.

## A.

■ The length of the delay is, in effect, a triggering mechanism. *Towles v. United States, supra* at 841; *United States v. Bolden, supra* at 627. Here, appellant was first arrested on August 15, 1978 and charged with the felony murder of another victim which occurred on July 13, 1978. He was released to the third party custody of his mother on August 17. The following day, appellant was arrested and charged with the felony murder of John McCormick. Appellant finally came to trial on January 17, 1980. This delay of over 17 months gives prima facie merit to appellant's claim that the first factor of the *Barker* test has been satisfied in his favor. *Bean v. United States*, D.C.App., 409 A.2d 1064, 1066 (1979). After such a delay, prejudice need not be affirmatively shown by the accused, *Moore v. Arizona*, 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973), and a heavy burden then shifts to the government to justify the delay. *United States v. Bolden, supra* at 627. However, the analysis does not end here, and the remaining factors must be equally considered. *Campbell v. United States*, D.C.App., 391 A.2d 283, 286 (1978).

## B.

■ As we have previously stated: "In an evaluation of the reasons for delay, dif-

ferent weights should be assigned to different reasons." *United States v. Bolden, supra* at 628; *see Barker, supra* 407 U.S. at 531, 92 S.Ct. at 2192. Here, the first seven months, from appellant's arrest on August 15, 1978 to his first status hearing on March 15, 1979, were taken up with the "routine matters" of preliminary hearings, the initial indictment and arraignment. The delays caused by these "normal pretrial steps" are attributable to the government, but "the prosecution cannot be strongly faulted for the inevitable delays which are inherent in the proper and deliberate functioning of the judicial system." *Bowman v. United States, supra* at 31.

■ The next five-month delay, from March 15, 1979 to the first trial date of August 16, 1979, was due to the institutional delays of court congestion and a busy prosecutor's schedule. At the status hearing, both parties agreed that additional discovery and the filing of motions would be completed during this time. Further, appellant agreed with the court's suggested trial date of August 16. This period is also a "neutral one" and "appellant's acquiescence in this delay results in minimal weight being accorded to that period." *Campbell v. United States, supra* at 286.

■ The next trial date was continued to November 15, 1979, an additional delay of three months. This continuance was granted over appellant's objection, and while the purpose of the delay was not explicitly stated, it appears that this period was also attributable to court congestion. This neutral delay, while chargeable to the government, is also weighed less heavily than tactical delay or delay which is intended to harass the defense. *Freeman v. United States,* D.C.App., 391 A.2d 239, 241 (1978); *United States v. Lara,* 172 U.S.App.D.C. 60, 65, 520 F.2d 460, 465 (1975).

■ At a status hearing on October 31, 1979, appellant's motion for severance of the defendants was denied, based on the understanding that the government would sanitize statements made by the co-defendant to permit their use in a joint trial of both defendants. However, on November 15, the government informed the court that it could not adequately sanitize the statements and that severance was therefore appropriate. The government then decided to proceed against the co-defendant first, and appellant's trial date was continued until January 11, 1980. At that time, the court was engaged in trial and this case was carried in a back-up status until January 17. Thus, the final two months, from November to January 17, 1980, were attributable to both the government's inability to sanitize the co-defendant's statements and its decision to proceed first against appellant's co-defendant.

In a post-trial hearing on this motion, the trial court attributed the second and third time periods, consisting of eight months, and the final two-month period, to "court processing." The trial court charged these ten months to the government, thus placing ultimate responsibility for the entire 17-month delay upon the government, but further held that these delays were of a more neutral nature and were not designed or sought by the government for any tactical advantage.[2] We agree that "the bulk of the delay was due to a 'neutral reason'; *viz.,* court congestion or institutional delays," and, therefore, this delay is to be weighed less heavily than if the government had purposely sought continuances to gain a strategic advantage or otherwise hamper appellant's defense. *Towles v. United States, supra* at 842; *United States v. Bolden, supra* at 628; *Reed v. United States,* D.C.App., 383 A.2d 316 (1978).

### C.

■While appellant's formal motion to dismiss for lack of speedy trial was filed on November 9, 1979, the trial court properly noted that it could infer the earlier assertion of appellant's right from his continued

---

2. We would only note that, in bringing its inability to sanitize the co-defendant's statements to the court's attention, the government may have acted more expeditiously in notifying the court sometime before the very day of trial, November 15, 1979.

incarceration. *See Strickland v. United States*, D.C.App., 389 A.2d 1325, 1331 (1978), *cert. denied*, 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 481 (1979). In addition, the trial court's ruling is reinforced by appellant's continued renewal of his motions for reduction of bond, including during his arraignment on February 28, 1979, his first status hearing of March 15, 1979, and at another status hearing on July 25, 1979.[3] Thus, we conclude that this factor must be weighed in appellant's favor.

### D.

▮▮▮ Regarding the prejudice to appellant as a result of the 17-month delay, we note that three interests of a defendant are protected by the right to a speedy trial:

> (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused, and (iii) to limit the possibility that the defense will be impaired. [*Barker, supra* at 532.]

While in a case such as this the prosecution carries the burden of rebutting the presumption that prejudice has resulted from excessive delay, the record indicates that no substantial prejudice to appellant was caused by this delay of nearly one and a half years. *Bowman v. United States, supra* at 32; *United States v. Bolden, supra* at 628; *see Hedgepeth v. United States*, (Hedgepeth II), 125 U.S.App.D.C. 19, 22, 365 F.2d 952, 955–56 (1966).

Initially, we emphasize in this case that the post-trial findings by the trial judge "have provided a more useful perspective and basis for review of record findings as to prejudice" than would the findings made by a motions judge in a pretrial hearing on a defendant's speedy trial claim. *Day v. United States*, D.C.App., 390 A.2d 957, 971 n.7 (1978); *see United States v. MacDonald*, 435 U.S. 850, 860, 98 S.Ct. 1547, 1552, 56 L.Ed.2d 18 (1978). ("The essence of a defendant's Sixth Amendment claim in the usual case is that the passage of time has frustrated his ability to establish his inno-

cence of the crime charged. Normally, it is only after trial that the claim may be fairly assessed.") Thus, the post-trial perspective is particularly significant to a trial court's finding of lack of prejudice in the *Barker* analysis, and such a finding deserves considerable deference in our review on appeal.

Further, we recognize that prejudice remains only one of the four relevant factors mentioned by the Supreme Court when it first developed the appropriate analysis to be applied when reviewing an alleged Sixth Amendment violation. Hence, a post-trial finding of no prejudice does not create an insurmountable barrier that may not be outweighed by the "sensitive balancing" process involving the remaining three factors. In fact, we have held that the overemphasis by a trial court of one of these factors may constitute reversible error where the exaggeration of a single factor's weight reflects a lack of the "delicate judgment" necessary to a valid speedy trial determination. *United States v. Bolden, supra* at 627; *see Day v. United States, supra* at 973; *United States v. Mack*, D.C.App., 298 A.2d 509, 511 (1972).

Appellant was incarcerated throughout the entire pretrial delay, and we conclude that this was, indeed, "oppressive pretrial incarceration." As the Supreme Court noted:

> there are serious societal disadvantages of lengthy pretrial incarceration, but obviously the disadvantages for the accused who cannot obtain his release are even more serious. The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational and rehabilitative programs. The time spent in jail is simply dead time. [*Barker, supra* 407 U.S. at 532–33, 92 S.Ct. at 2192–93; footnote omitted.]

While we find this factor to weigh heavily in appellant's favor, pretrial incarceration is one of the three interests to be evaluated in

---

**3.** We do not find appellant's acquiescence to the setting of an initial trial date of August 6, 1979, during his first status hearing on March 15, 1979, to be an indication of a "somewhat equivocal" assertion of his speedy trial right as suggested in the government's brief.

determining whether the pretrial delay has resulted in prejudice to the defendant. "While lengthy pretrial confinement certainly is an unfortunate element of our backlogged criminal justice system, it is not by itself sufficient to warrant dismissal of the indictment." *Towles v. United States, supra* at 842.

Regarding the additional two interests that the speedy trial right was designed to protect, the Supreme Court stated that "the most serious is [impairment of the defense by delay], because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker, supra* 407 U.S. at 532, 92 S.Ct. at 2193; *Towles v. United States, supra* at 842. The trial court, during the post-trial hearing, implied that while the pretrial incarceration may have resulted in anxiety, "this was not a case in which we had a loss of any potential evidence and that, indeed, the defense was able to preserve a substantial and lengthy alibi defense." We agree that appellant suffered the attendant anxiety related to a pretrial incarceration period of 17 months, but we point out that this anxiety was somewhat mitigated, if only minimally, because the detention did not adversely affect employment or education. These considerations may be taken into account in an attempt to arrive at the difficult, if not impossible, determination of the anxiety resulting from pretrial incarceration. *See Barker, supra* at 532–33, 92 S.Ct. at 2192–93; *Branch v. United States, supra* at 1002. Furthermore, appellant's primary contention on appeal is that this delay resulted in both defense and government witnesses' "faulty recollection of events."

Initially, in reviewing appellant's contentions regarding his alibi witnesses' loss of memory due to the pretrial delay, the trial court's post-trial findings as to appellant's ability to present a coherent defense are particularly illuminating and helpful. Appellant contends that several of his alibi witnesses were unable to recall specific events and were uncertain about the cir-

cumstances surrounding his whereabouts on the evening of July 12. This was the evening before the early morning shooting of William Horn, and appellant was subsequently acquitted of this charge.[4]

Although he was acquitted of this felony murder count, appellant contends that the "lack of recollection about the events of July 12th and 13th had to affect the credibility of [the witnesses'] alibi testimony about the events of July 25th and 26th." (Appellant's Brief at 28.) However, appellant has failed to indicate how partially uncertain alibi testimony resulting in his acquittal of one count of felony murder could have adversely influenced the testimony of these same witnesses concerning his alibi for the events of July 26. Further, each of the points of uncertainty complained of by appellant was established through the testimony of other witnesses.

As to the alibi testimony of appellant's whereabouts during the early morning hours of July 26, appellant asserts that a "serious mixup" occurred concerning the exact dates that his mother was out of town and during which time he and his brother were staying in Mrs. Tribble's Seat Pleasant, Maryland, apartment caring for their aged grandfather. During this time, Sandra Moore and Dara Milline were also staying with the Tribble brothers in the apartment. However, Mrs. Tribble herself testified that she had been out of town between July 21 and July 28, 1978, and appellant also submitted into evidence the receipt from Mrs. Tribble's airline ticket. Further, it was the "central point" of appellant's alibi defense to the second murder charge that Dara Milline's birthday was celebrated on July 26, at Mrs. Tribble's home, because appellant could remember that he and Mrs. Moore stayed in the house during the entire evening before the party, July 25.

Sandra Moore testified that appellant never left the house on July 25–26, and Mrs. Milline recalled that appellant was in the

---

4. Appellant claimed that his sister could not recall whether he left with her and others from their mother's house that evening and that his brother could not remember whether appellant was in the house on the morning of the 13th or when his brother left for court.

apartment when she went to sleep at 2:00 a. m. on July 26, and that he was still there when she awoke later that morning. Finally, James Tribble testified that appellant was in the apartment when he went to bed between 11:00 and 11:30 p. m. on July 25 and that appellant was sleeping when he awoke the next morning at approximately 4:45 a. m. to go to work. The record reveals that appellant had a definite date around which to base his alibi for the second felony murder, and all of his alibi witnesses placed him at his mother's apartment at the time of the shooting.

We conclude that appellant suffered no prejudice as a result of the pretrial delay in presenting a coherent and comprehensive alibi defense as to both incidents. Appellant has proffered "no specific evidence which has actually disappeared or has been lost, no witnesses who are known to have disappeared," *United States v. Ewell*, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966); *Day v. United States, supra* at 971; *Branch v. United States, supra* at 1002. Further, because his defense was presented through members of his family and close friends, this delay did not substantially impair his ability to locate witnesses and prepare a cogent alibi defense. Although appellant's witnesses may have been tentative about certain minor details surrounding these events, "we believe that any prejudice caused by failure of memory displayed [in the record] was negligible." *Gaffney v. United States*, D.C.App., 421 A.2d 924, 929 (1980). In this respect, appellant's defense to the second murder charge "failed not because his witnesses' memories were dimmed, but because the jury" apparently found his second alibi to be unbelievable. *Bowman v. United States, supra* at 32.

Finally, appellant argues that the faded memory of one of the government witnesses was so severe as to prevent him from effectively cross-examining her. Basically, this witness, a Mrs. B. J. Phillips, testified that she knew appellant and the co-defendant, and that she had often seen them together. Further, she stated that on two separate occasions during July 1978, appellant had come to her apartment and admitted that the co-defendant had shot someone in his presence. This witness testified also that appellant and the co-defendant had come to her apartment in August in order to sell a gun to her roommate. Mrs. Phillips' roommate eventually bought the pistol, and Mrs. Phillips later gave an empty shell casing from this gun to one of the investigating officers. Finally, Mrs. Phillips had several contacts with the investigating police officers and helped them in gathering evidence relating to the homicide.

Appellant claims that, during his cross-examination of Mrs. Phillips, her frequent statement that "she couldn't remember back that far" hindered his efforts at effectively impeaching her. Primarily, we note that deficiencies in the testimony of government witnesses generally benefit a defendant's case rather than work to its detriment. *Reed v. United States, supra* at 320; *United States v. Calhoun*, D.C.App., 363 A.2d 277, 281–82 and n.7 (1976); *United States v. Lynch*, 163 U.S.App.D.C. 6, 15, 499 F.2d 1011, 1020 (1974). Further, the record indicates that appellant was able to challenge Mrs. Phillips' credibility in many instances. He impeached her with prior inconsistent statements made to the police and to the grand jury and further suggested that she had cooperated with the police only because she had been threatened with obstruction of justice. Finally, Mrs. Phillips responded on several occasions that she could not remember a certain date or time of day because she was "trying to block all of that junk out of [her] mind," suggesting that any memory lapse was deliberate rather than a result only of the passage of time. We find that appellant was able to adequately cross-examine this government witness and that the pretrial delay did not prejudice appellant in this respect.

We conclude that the government's argument of no prejudice "convincingly outweighs" appellant's assertions to the contrary and that there is no reasonable possibility of prejudice to appellant's defense preparation from the substantial delay. *Barker v. Wingo, supra* 407 U.S. at 532–33, 92 S.Ct. at 2192–93; *Day v. United States,*

*supra* at 973. Although the 17-month delay between appellant's arrest and trial was undesirable, we conclude that the four factor *Barker v. Wingo* analysis establishes that appellant was not denied his Sixth Amendment right to a speedy trial.

## II

■ Turning to sentencing, appellant argues that the trial court erred in making a determination that he would not benefit from a sentence under the Federal Youth Corrections Act. 18 U.S.C. § 5005 *et seq.* Appellant urges that the trial court was not aware of the applicability of the F.Y.C.A. to otherwise eligible defendants convicted of felony murder, and that the trial court's reasons in support of its finding of no benefit were inadequate. We conclude that the record establishes that the trial court was fully cognizant of the applicability of a sentence under the F.Y.C.A. to this appellant, even though he had been convicted of felony murder, and that the trial judge's reasons justifying a finding of no benefit were entirely adequate in the instant case. The trial court properly exercised its discretion in sentencing appellant as an adult offender rather than as a youth under the F.Y.C.A.

On March 12, 1980, the date originally scheduled for sentencing, the court continued sentencing to May 12, 1980 to allow a study of appellant's suitability for sentencing under the Youth Act to be conducted. 18 U.S.C. § 5010(e). As completed, the study recommended a Youth Act sentence, and a psychological evaluation of appellant prepared by Dr. Robert Jones, a psychologist and member of the Lorton Youth Center Classification Committee, noted that appellant exhibited some "moderate neurotic traits which have hindered normal growth and development." [5]

At the sentencing hearing on May 12, 1980, the trial court noted that the psychological evaluations before the court indicated that appellant "has substantial potential for being a very dangerous individual." After hearing statements from both counsel as well as appellant, the trial court pronounced sentence:

Mr. Tribble, as you recognize, the jury has returned its verdict in this matter. I have, of course, considered all of the material that has been presented and I have come to the conclusion, however, that the Youth Act is not the appropriate manner in which the Court should sentence you. The Court must consider not only your situation, but the nature of what occurred. *When I look at your situation, in particular, the indicia of the serious mental problems suggest to me circumstances with which the Youth Act has not traditionally dealt very well, circumstances which, contrary to their view, I have not observed to be within their competence and expertise.* Further, it appears to me, and I conclude, that homicide is not the youthful indiscretion that falls within the type of activity of persons with whom they should be dealing. The Court is of the view that in the adult system, you may be able to receive and should be able to receive the extensive remedial assistance that appears to be required. When the Court proceeds in an adult matter, it notes, of course, that it is bound by the statutorily prescribed punishment which suggests to me, in its prescription, the manner in which this community has determined that homicide, whether committed by young people or old people, should be dealt. While that is not a dispositive factor, it none-the-less, requires this Court, having elected an adult sentence, to impose twenty years to life on the charge of homicide. [Record at 12–13 (emphasis added).]

On appellate review, we recognize that "a sentencing court may not impose an adult sentence on a youth offender unless it first finds that he will not derive benefit from Youth Act treatment." *Small v. United*

---

5. In addition to the Youth Center Classification Committee Report, the court received the Presentence Report, Parole Board Report and an independent psychodiagnostic evaluation of appellant submitted by Dr. Neil P. Schiff, who diagnosed appellant as suffering from latent schizophrenia.

*States*, D.C.App., 304 A.2d 641, 643 (1973) (emphasis omitted). This finding must appear on the record, but it need not be based upon a statement of supporting reasons. *Dorszynski v. United States*, 418 U.S. 424, 425–26, 94 S.Ct. 3042, 3044–45, 41 L.Ed.2d 855 (1974); *Johnson v. United States*, D.C. App., 391 A.2d 1383, 1385 (1978). Once we conclude that the sentencing court considered the option of treatment under the Youth Act and subsequently rejected it, no further review of the sentence is necessary. *Cambrel v. United States*, D.C.App., 330 A.2d 746, 748 (1975); *see Dorszynski v. United States, supra* 418 U.S. at 443, 94 S.Ct. at 3052.

Appellant agrees that the trial court made an explicit finding of no benefit but argues that the court erroneously believed that it could *not* impose a Youth Act sentence on a defendant convicted of felony murder. If the trial court had made such a finding, it would have been in error, as we have held that a Youth Act sentence may be imposed upon an otherwise eligible defendant convicted of felony murder. *United States v. Stokes*, D.C.App., 365 A.2d 615 (1976). We conclude that the sentencing transcript establishes that the trial court was well-aware of the availability of a Youth Act sentence for appellant.

Here, the court ordered that a § 5010(e) study be conducted to determine appellant's suitability for a F.Y.C.A. sentence. We conclude that the trial court would not have postponed sentencing for two months and ordered this comprehensive report if it believed that it could not ultimately sentence appellant under the F.Y.C.A. Further, although the trial court commented that "homicide is not the youthful indiscretion that falls within the type of activity of persons with whom [institutions administering the Youth Act] should be dealing," the court had already ruled that appellant would not benefit from a Youth Act sentence. This statement suggests that the trial court viewed the nature and gravity of the offense as a factor to be considered in deciding whether appellant would benefit from a Youth Act sentence. *See generally,*

*Cambrel v. United States, supra* at 748; *Bettis v. United States*, D.C.App., 325 A.2d 190, 198 (1974).

Further, we reject appellant's argument that the reasons justifying the trial court's finding of no benefit were inadequate. In *Dorszynski v. United States, supra*, the Supreme Court expressly rejected the contention that a sentencing court be required to justify a finding of no benefit by providing an explanation of its reasoning. In discussing the sentencing discretion accorded a trial court under the F.Y.C.A., the Supreme Court stated that "the Act was meant to enlarge, not restrict, the sentencing options" of trial courts. *Id.* 418 U.S. at 436, 94 S.Ct. at 3049. We have considered similar claims and concluded that arguments premised solely on the factual basis of a no benefit finding do not support an appellate ruling that the trial court abused its sentencing discretion. *Tuckson v. United States*, D.C.App., 364 A.2d 138, 142 (1976); *Smith v. United States*, D.C.App., 322 A.2d 592, 593 (1974). The trial court may properly consider the recommendations of a § 5010(e) study in making its sentencing determination, but the trial court must reach its own conclusion as to whether a particular defendant will benefit from a sentence under the Youth Act. *Johnson v. United States, supra* at 1384. Here, we conclude that the trial court properly considered appellant's apparent mental and emotional instability in ruling that he would not benefit from treatment available under the Youth Act and that he should instead be sentenced as an adult. We conclude that this was a proper exercise of the trial court's sentencing discretion.

Finally, appellant received concurrent terms of incarceration of 20 years to life on each separate count of felony murder and armed robbery. Although appellant did not raise this issue, the government concedes that appellant's sentence for armed robbery must be vacated in light of *Whalen v. United States, supra*, and *Ball v. United States, supra*. We agree, and conclude that appellant's sentence for armed robbery must be

vacated and the case remanded for resentencing.

In *Whalen v. United States, supra*, the Supreme Court reversed a decision by this court ruling that Congress had authorized consecutive sentences for the crimes of killing in the course of a rape and the rape itself. *See* D.C.Code 1973, § 23–112. Applying the rule enunciated in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court concluded that the offense of rape merges for purposes of punishment with the felony murder offense, "since it is plainly not the case that 'each provision requires proof of a fact which the other does not.' A conviction for killing in the course of a rape cannot be had without proving all the elements of the offense of rape." *Whalen v. United States, supra* 445 U.S. at 693–94, 100 S.Ct. at 1438–39 (citations omitted). The Court ruled that the imposition of consecutive sentences for these crimes violated the Double Jeopardy Clause of the Fifth Amendment. *Id.* at 695, 100 S.Ct. at 1439.

In *Ball v. United States*, we applied the rationale of *Whalen* and *Blockburger* to a situation not controlled by present D.C.Code 1981, § 23–112, since the appellant in *Ball* had received *concurrent* sentences rather than consecutive sentences for two statutory offenses. Nonetheless, we held that:

concurrent as well as consecutive sentences constitute multiple punishment for purposes of double jeopardy and . . . that a concurrent sentence for conviction of a separate offense, while not entailing a lengthier incarceration, nonetheless implicates possible collateral consequences which effectively result in "multiple" or "cumulative" punishment. [*Ball v. United States, supra* at 1358 (citations omitted).]

In consideration of *Whalen* and *Ball*, we conclude that a conviction for killing in the course of an armed robbery cannot be had without proving all the elements of the offense of armed robbery, and we find that appellant's sentence for armed robbery was illegal under these circumstances.

We find appellant's additional arguments to be unpersuasive,[6] and we accordingly affirm his convictions of felony murder and armed robbery but we vacate his sentence for armed robbery and remand for resentencing.

*Affirmed in part; vacated and remanded in part.*

6. Appellant claims that the trial court erred in denying his motion to suppress a box of ammunition seized during a police search of his mother's house where he lived, arguing that his mother did not freely and voluntarily consent to the search. We conclude that the trial court's finding that appellant's mother consented to the search is well-supported by the record. *Terrell v. United States*, D.C.App., 361 A.2d 207, 210 (1976).

We also conclude that the trial court properly admitted testimony concerning appellant's sale of a revolver to Brenda McLean, since such evidence constituted consciousness of guilt, and the prejudicial impact of introducing this testimony, which appellant unconvincingly argues could have constituted "other crimes" evidence, did not far outweigh its probative value. *Willcher v. United States*, D.C.App., 408 A.2d 67, 75 (1979). Further, appellant has failed to establish that he was deprived of the effective assistance of counsel. *Oesby v. United States*, D.C.App., 398 A.2d 1 (1979).

We also conclude that the trial court properly allowed a police detective to testify that he received over the telephone from B. J. Phillips the serial number of the gun appellant sold to Brenda McLean and what the serial number was, since this was extremely reliable evidence such as that constituting extra-judicial identification testimony which is admissible as substantive evidence. *See Rice v. United States*, D.C.App., 437 A.2d 582 (1981); *Wilkerson v. United States*, D.C.App., 427 A.2d 923 (1981); *see also United States v. Medico*, 557 F.2d 309 (2d Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977).

Finally, the evidence in our view was sufficient to sustain appellant's convictions for armed robbery and felony murder, since appellant's corroborated admissions, coupled with the government's evidence of the crime itself and the circumstantial evidence of appellant's participation reasonably permit a finding of guilt beyond a reasonable doubt. *Grogan v. United States*, D.C.App., 435 A.2d 1069, 1071 (1981); *Womack v. United States*, D.C.App., 350 A.2d 381 (1976).